Tate. Good morning, Your Honors. May it please the Court, my name is Scott Tate and I represent WASCO PRODUCTS, the appellant in this matter, and I would like to reserve seven minutes, if possible. You just watch your time. Yes, Your Honor. I believe, Your Honor, that there are two major areas of discussion for today, which led to the four different errors that we pointed out in our opening brief on appeal. And the two major topics, of course, in this case, are the application of the Economic Loss Doctrine as it's applied in the State of California, and the second one is the application of various statutes of limitations to the several claims that are at issue here. Mr. Tate, I freely confess to being a technological moron. So, but it just does look to me as if the sealant that you're complaining about is absolutely integral to the product. I mean, it's the thing that makes the glass stick together. Yes, Your Honor. So it has no independent value or use to the consumer or part of it. I mean, you're going to scoop the sealant out and do something else with it. So, you know, on what basis can you really assert that the Economic Loss Doctrine does not apply? Well, Your Honor, first of all, the application of the question that you raised, whether or not it's an integral product, that presupposes a determination that we're looking at the product being the window. And if you look at the majority opinion in the Amenas case, the majority opinion says that you must focus on the product that's placed into the stream of commerce, which is consistent with Saratoga, consistent with East River, consistent with everything. And, in fact, the majority opinion, which is signed off on by six of the seven justices, the majority opinion focuses on the entire history of strict products liability in the State of California, as you know, beginning with Justice Treanor way back in 1949. And the key through all of the development of strict products liability is to place liability on those in the stream of commerce and who are responsible for placing that product in the stream of commerce. Every one of the cases cited, Greenman, Vandermark, et cetera, as we all know from the majority opinion, places that paramount. That is the premise or the beginning discussion in the opinion. Then, opposed to that, the Court says, now, opposed to that, we must apply the economic loss doctrine. And in order to do that, we must determine what the product is here. There is no question that the product here placed into the stream of commerce by Bostic was sealant. There is no question. There's a big question. I mean, when you play at that level, you'll lose the forest. And the whole idea here is the difference between contract and warranty and force. And you lose the force when you play everything as a product. I mean, your analysis, everything is a product. No, Your Honor, not necessarily. How do you make the differentiation? Because at some point, everything goes into the stream of commerce, so everything is a product. No, Your Honor. If you bought raw material, for instance, and the raw material in and of itself failed, that would be the product causing damage to itself, as opposed to a component that's incorporated. Which there would be liability arising out of contract. That's correct. Tort, because it's a product. And that's the purpose. Not tort, because it's a product. Well, it would be controlled by the contract, assuming there was a contract, as the Court points out. And that is the very question that you focus on in KB or in East River or Saratoga. What is the product which was placed into the stream of commerce by the different people? Yeah, but you can't just look at it in terms of, you know, stick your nose in something and say, is that a product? There's a larger context in which this works. A larger context is, you know, what's the difference between tort and contract and warranty and all of those kinds of things. I fully agree. Your idea of what's a product seems to just obliterate the entire purpose of the economic loss doctrine. It's gone. Well, I don't agree with that characterization, but I understand, Your Honor, and I think you can find solace in the KB or in the Jimenez case where the product is. I don't find solace. Go ahead. Let me ask you a question, if I could. Is your theory that any time something goes into the stream of commerce, it becomes a product for the – for this doctrine? Yes. That's what I heard you say. So in this case, you have a product that is the sealant. You have a product that's the heat mirror, because they both went into commerce. And you have this entire gadget that's put together, and it's also a product. Yes. So all of these are products. Yes. Now, at some point, though, you have to decide the product is for a purpose. This isn't a case where the sealant went out and it dropped on somebody's foot. The sealant became material to your case when it became part of the process. Yes. So if – don't we have to get the relevant product that we're going to deal with as far as a lawsuit is concerned? And the relevant product wasn't when it first went into a box and dropped on somebody's foot. The relevant product occurred when you got this gadget put together. Yes, Your Honor. From the purchasing standpoint between WASCO and the entity with whom they were purchasing the completed window, IGU in the papers, the completed window, that is a product. That is a – that is a distinguishable situation than what we have here. By the way, the purveyor, UltraCarefree, went bankrupt. The only – the party within the stream of commerce with whom they were in contract, they're bankrupt. That's why they're not present, obviously, for other reasons. So that is why here we have two parties not in contract, didn't agree, but what WASCO was damaged is the product they purchased was damaged by another product, which the Wasco didn't buy the sealant, did they? Well, actually, Your Honor, they did. There are two different sealants at issue. The primary one that's relevant with the south wall and the heat mirror windows, they did not buy the sealant, correct. The person that put it together put it together bought it. Yes, Your Honor. And that was this Carefree, Ultra, and then ultimately other companies. But in the Jimenez case, remember, Mr. and Mrs. Jimenez purchased a completed home. That is the product which they purchased. And what they sought was relief not from the seller of the purchased home, not the developer, not the builder. They sought relief from another party who had supplied windows, which were defective, which led to damage to the completed home, to other property. And the question is, for these defendants, their product, does it cause damage to other property? And clearly, the Bostick sealant, by failing, causes damage to other property. And the other property here is the completed window, which was purchased, which was manufactured by Carefree. Well, that's like a house of cards argument. What do you do with these factors that are in McDowell Valley Vineyard to talk about KB, whether the defective component performs an integral function in the operation of a larger product? Answer here, yes. That's the only one that militates in favor, Your Honor. If you look at the other factors, and there are four of those. Whether the component has any independent use to the consumer. Now, what independent use to the consumer does the sealant have? The sealant in this larger product. Answer, none. None in this particular case. Okay, that's two. How related the property damages to the inherent nature of the defect in the component? That's three against you. Whether the component itself or the larger product was placed into the stream of commerce. That's another one against you. Whether the component was purchased from another manufacturer. Whether the larger project was sold in other markets. Whether the component can be readily removed from the larger product. No. I mean, these factors seem to line up against you just as you run through them. I respectfully disagree, Your Honor. When you ‑‑ if you look at KB, the court of appeal opinion, they focus on four of those factors. And I disagree with your characterization, and let me tell you why. Was the component placed into the stream of commerce? The answer is the component was placed into the stream of commerce. That's issue number one. Every component is at some level. That's the problem with your argument. Well, and that's precisely where strict products liability law seeks to place responsibility and liability from Vandermark all the way through to the present. You're just throwing the economic loss doctrine out the window with your interpretation of what the product is. Because every product that's made up of other products is made up of other products. Well, Your Honor. And you want to start at the garden of Eden, and that's the end of the whole doctrine. That's why it doesn't work. Well, the product that was placed into the stream of commerce in Jimenez, Your Honor, was the completed home. Yet they did not bar the claim against the component manufacturer. And those factors, which you see cited in KB Home after Jimenez opinion, are not in the majority opinion, I might add. The question is, what was the product that was placed in the stream of commerce? And in Jimenez, it clearly was not the windows. The product that was placed in the stream of commerce was the completed product. In East River Steamship, the fact was is that the completed turbine was placed into the stream of commerce. The parties are different here. We are not suing the party who placed the house into the stream of commerce. It's a component part manufacturer. If I could turn to the statute of limitations argument in the next few minutes, Your Honors. I believe there are several issues where the court erred because I believe the court improperly weighed evidence and came to some conclusions which were not justified. The fact that Mr. Sampson was put on some notice that there were elevated seal failures led him to believe that there were facts that were a problem. And he began to, as the law required, he began to investigate. A reasonable, diligent investigation is required, which led him to these defendants. And both of these defendants volunteered to undertake investigations. They did not simply deny liability, as they argue in the Respondent's Brief. No. They volunteered to undertake a responsibility, and in discharging that responsibility, affirmatively misled. What your client disbelieved. Your Honor, what my client believed was the sealant was still at fault, which, as my papers in the reply brief demonstrated, as Southwell recognized in its Respondent's Brief or in its papers in the district court. There are a number of ways where the sealant is still at fault because of manufacturing errors, which were the very errors which these parties pointed to, not telling Wasco that, yes, two months before, we had already recognized that this sealant should not be placed in sloped applications. The report, the Costanzo report from August of 1997, is very clear. It's one page, and it says this sealant is not sufficiently strong for sloped applications, which means skylights, etc. They undertook the duty, and they did not discharge it fully or truthfully. Both of those are aggravating factors which I believe overcome this argument that they simply denied liability. Is your theory that it begins to run when there's appreciable and actual damage? As for some claims, yes. Once one has damage, then one has a cause of action which may begin to run as long as you know that some wrongful conduct has led to that claim, which is what I think Fox v. Ethicon recently argued. But in unfair business practices in California, doesn't the statute in all of them run when there's appreciable and actual damages? That's why I said under some cause of action, Your Honor. Under the unfair competition law, yes, it would begin to run. Wasn't he aware that there was damages when it went from 1 percent that he anticipated failure up to 3 percent? He was not. Why was that? Why isn't that appreciable and actual damages? He was not aware of any unfair act of competition at that point, Your Honor. He was aware of appreciable and actual damage. Yes, Your Honor. And that's what City of San Diego v. U.S. Gibson holds. That's the test. Well, that is not the City of San Diego case, Your Honor. There are three bases for that holding, and one of those is that the asbestos is completely inundated in the buildings and is naturally deteriorating at that time universally. Remember here we have a series of transactions, a series of purchases. And remember, Your Honor, when they told Wasco that it was all manufacturing error and they continued to make separate purchases, they purchased from different manufacturers, not Ultra and not Carefree, and solicited the defendant's assistance in pursuing those manufacturers who they believed and confirmed in writing at the record at 1001 and 11, confirmed that they believed that it was manufacturing error. There continued to be purchases after that. Each of those purchases under Beaumont, I think is the clearest case, which found 14,000 different violations of the unfair competition law cascading after a series of leases, many of those occurring well after the initial four-year execution of the lease, Your Honor. Each of those payments was an act which constituted an unfair act under the unfair competition law. We have both here. We have 17,000. I don't see these continuing causes of action. Cascade says that they don't read, that they reject that as a theory of the beginning of the statute of limitations. It rejects this continuing wrong approach. Your Honor, Beaumont endorses that philosophy under the original, under their original leases which occurred, and payments under those leases long after the four-year statute of limitations yield violations under the Beaumont case. Very clearly. Totaling up to 14,000 different violations. What do we do with Cadmus design systems where they specifically say that they, quote, rejects the continuing wrong approach to the statute of limitations, close quote? It is not a continuing wrong. They are separate wrongs. Each time there is a separate act, each purchase constitutes a separate violation under the UCL, under 17200, and here under 1725. Well, you could continue to have these wrongs for 20 years and then decide this particular one is the one I'm going to file on. Yes. Yes, Your Honor. Would you be able to get damages for the ones that occurred for the preceding 20 years? Absent some cooperation between the two parties, you would be limited to the last four years under. Even aside from that, I'm talking from a legal point of view. No. You could get the entire 20 years? I don't believe so. I think the reading of the statute is stricter than that, Your Honor. You would get the last four years of violations under the UCL. It either rejects the continuing wrongful approach or it doesn't reject the continuing wrongful approach, and Cadmus says that we reject it. Your Honor, those are not continuing wrongful approach. What I submit to the Court is that they are continuing purchases. Each of those purchases constitutes the final. So it's the same product doing the same thing, no change at all. That's not a continuing wrongful approach. I think it's a series of transactions, Your Honor. And I think Beaumont ---- What's the purpose of the statute of limitations, the entire concept when you do something like this? I beg to differ, Your Honor. What it says is that you will be limited for those four years. What it does is give the defendant repose for the first 16 years under what Judge Wallace poses. What it does is give you repose for that. Particularly, that's not a concern here. With knowledge that you've had a cause of action for seven years? No, Your Honor. Then you can walk in and buy another one and it's a violation. No, Your Honor. Remember, this is not a knowledge case or claim. It's a strict products ---- it's a strict liability statute for wrongful conduct. It is not a knowledge statute. You could discover the wrongful aspect in year 16, as Judge Wallace poses, and you could bring the action for those four years directly preceding. Now, there is an additional gloss over on top of this, and that is that these parties clearly, as the factual record demonstrated, jointly developed their own words, jointly developed the sealant, jointly knew the limitations of the sealant, met in Palo Alto, California, and documented the meetings knowing that these products, the sealant that is the subject of this litigation, did not do what it was represented to do. The language is stark. They continued to market this product. Every one of these specification sheets was wrong. Every one of them overstated the capabilities. And every one of those statements injured competition, injured not only the purchasers, but injured competition within the State of California and elsewhere. Now, Beaumont is very clear, I think, on what constitutes in this situation civil conspiracy. There is no claim about allegations here. This is an extremely detailed complaint interweaving the actions of these two parties. The conspiracy began back with the very development of this sealant and ran at least through the fact when inquired, they chose to not disclose in other litigation where Federal Rule 23 required them to distribute and produce the very document which said our sealant prematurely fails. They chose not to produce that. It doesn't matter if there's any discovery request. Under 23 then, under Rule 23 then, they had an obligation to produce it, and they both chose not to. The significance of that document cannot be understated. You rarely find it. Immediately upon drafting the document, Mr. Costanzo immediately faxed it to Southwall so that they could have their story straight, and they concealed it. There's no question that there's a concert of activity, and you can, as the Court of documents, you can infer certain facts. Here we have an agreement you can confer because they began with jointly developing this sealant. They jointly discussed its limitations and the fact that it was not up to what they claimed it to be. They jointly marketed it. They jointly distributed the materials, and they jointly concealed the true nature of their findings. I submit that where the district court said there was not a single fact from which the court could find or infer a civil conspiracy, I submit that there are a number, and I tried to put those in the papers. Was there an actual agreement that you were relying upon? No, Your Honor. There is not a written agreement. Other than the written documentation that says we hereby jointly developed this sealant, that is in writing, an announcement to the industry. There are written notes, obviously, of their discussions where they discussed the fact that in Palo Alto they discussed that the sealant goes to 140, not 200. There's the conversation between Duffy, which is memorialized in writing with Isles, where they both say, gosh, at anything over 140 degrees it will prematurely fail. Those writings memorialize the activity, but not a specific agreement, other than the fact that the initial joint development was announced in writing. Thank you, Your Honor. All right. Thank you, Mr. Tate. Ms. Columbia. Good morning. May it please the Court. My name is Sarah Columbia. I represent Southwall Technologies, Inc. Also at Appellee's table is David Scheidemantel, who represents Bostick, the other appellee in this case. The claims against Southwall, Your Honors, are for violations of the unfair competition law and for negligence. The claims against Bostick are slightly different. And we understand we have to share our time this morning. I would like to address Mr. Tate's points and any questions the courts have that are relevant to the Southwall position, but also to yield the podium to my brother from Bostick so that he may address the issues that are pertinent to Bostick. I will start with the economic loss doctrine, which, and first point out that the Menace case is a strict liability case and that there's no strict liability claim against Southwall. The portion of the KB Holmes factors, which Mr. Tate, on behalf of Wasco, failed to point out in response to the Court's question with respect to the component itself, is that the fourth factor, as enunciated in the KB Holmes case, was, was the component itself or the larger product placed into the stream of commerce. Wasco would say every product is placed in the stream of commerce, therefore, it is a product. However, the rest of that factor says, or viewed from the buyer's perspective, from Wasco's perspective, was the larger integrated product or the component itself the purchased item. And there's no question here but that the purchased item, purchased by Wasco, was the entire IGU, that the court below correctly found that the sealant manufactured by Bosco and recommended by Southwall was an integral part of that IGU unit, which cannot be removed, has no other purpose, and otherwise meets all of the factors from the KB Holmes test for, for finding that the IGU was the product, not the sealant. Your adversary relies heavily on KB Holmes because there was a window that was considered a separate product, and certainly the window was part of the house. Yes. And I think that's the Jimenez case, Your Honor, in which, in a strict liability context, the Jimenez court left open the possibility that where a buyer buys a home and in that home there's a window, obviously the window is something which can – windows have independent purpose. They are themselves products. They are sold to consumers. You can switch out your windows. You can, you can go to the Home Depot and buy replacement windows. That that Jimenez left open the possibility that in a strict liability context, that could be a component of the larger product, the home, and if it was defective causing damage to the home, there might be a route to strict liability. But in KB Holmes, the owner didn't buy the window separately from the home. In the Jimenez case, the owner did not. The owner bought the home, not the individual window. The plaintiffs in the Jimenez case were the home buyers. In this case, Wasco bought the IGU, but the IGU is made up of integrated components which cannot be removed from that IGU without destroying the IGU. You can remove your windows from your home and replace them without destroying your entire house. I think that's the way we do ask you to look at the difference between those two situations. On the statute of limitations issues raised by Wasco, there's no dispute that the discovery rule does not apply to the unfair business claims. There's no dispute that the Wasco became aware of its damages at least as late as 1997, probably 1995, and that the 4-year statute of limitations began to run either in 1997 or 1995 or in 1997, and that either way, the claims against Southwell under the unfair competition law are barred by the 4-year statute of limitations. Sampson said in his deposition that they begin to fail prematurely as early as 1995, and then you have the 1995 letter that says exactly that. That's correct. The judge below, Your Honor, relied on a October 6, 1997 letter from Sampson to the last possible date. And the one thing I want to point out there, which is very telling in contradiction of Wasco's argument, is that that letter didn't just say, I think there might be a problem with the sealant, and Wasco has kind of cooked up this argument that it could be any old problem with the sealant. Maybe the manufacturer mixed it incorrectly, and maybe there are other issues. That letter said there's a problem with the sealant purchased from Bostick. Not there may be problems with how it's mixed at the manufacturer, not there may be other problems in the manufacturing process, but in 1997, the letter from Sampson to the supplier said that he had concluded there was a problem with the sealant purchased from Bostick. And the ñ That's exhibit what? Huh. Is it four or 54? Excuse me. Just a second, Your Honor. It must be four. It's excerpt of record 13, page 1360, and specifically at page 1875 to 76 in the record appendix. With respect to the continuing violation theory, which would apply only to the ñ excuse me. With respect to the continuing violation theory, the idea that Wasco is putting forth here is that beginning in 1995, with knowledge that there was a problem with this sealant that was causing an increase in failure rates from 1 percent to 3 percent, Wasco was free to continue to purchase units containing that sealant and, as Judge Wallace pointed out, essentially to never have the statute of limitations begin to run. As was pointed out in our brief, the continuing violation theory simply doesn't apply where there's clear knowledge that the product you're purchasing is defective. You cannot, with knowledge that the product is defective, continue to buy it and wait until some date that's of your convenience to bring your cause of action for negligence or for unfair business practices. And here, the Sampson testimony makes it clear that at least by 1995, or at the latest by 1997, Wasco had that requisite knowledge. With respect to the conspiracy theory, as I'll call it, that Wasco has put forward, obviously that's being put forward here as a sort of last-ditch means to toll the statute of limitations from running. The court below in the hearing, which is in the record before this Court, asked Wasco, through its counsel, for every possible record reference to support this conspiracy theory. The court then, in its opinion, went very carefully through each reference provided to it below by Wasco. The court correctly concluded that none of those references proved that there had been an agreement to commit a wrong between Southall and Bostick, and that at best they showed some sort of parallel activity, joint development, none of which is sufficient in the context of tolling the statute of limitations to prove up a conspiracy. We have, in our brief, addressed several other grounds on which the decision below could be upheld. Your Honor, I would be happy to go into any of those if the Court has questions. Otherwise, I would yield the podium to my colleagues. Kennedy, I know you rely as heavily on the Beaumont case, especially in relationship to Cadden's design systems. What is your response to his argument on Beaumont? The primary response, Your Honor, is that the findings with respect to the continued overt acts are consistent. That is, in the Beaumont case, the Court found two things which are simply not present here. One, they found an act of conspiracy with evidence of an agreement to commit a wrong. And in light of that, they found that each time it involved a trailer park and rentals in a trailer park, but that each time the wrongdoers who had conspired to do wrong renewed leases for those trailer homes, they were committing a new overt act of wrong toward those leaseholders. The other major difference, Your Honor, is that in that case there was absolutely no evidence that the plaintiffs were already on notice and aware of the wrongdoing. Here we have a situation where it is undisputed and the Court has found that Wasco, as of 1995 or 1997, was aware that it had a sealant problem. And in the Beaumont case, there's no evidence that the plaintiffs had any sort of similar awareness. And so there's no evidence that they should have been on notice of that. Thank you. May it please the Court, David Scheidemantel for Eppley-Bostick. The case has an appearance of complexity in either the length of the briefs and the volumes of transcript, but it's really quite simple. On the economic loss issue, it comes down to two things, the K.B. Holmes case and John Duffy's declaration, which was submitted by Bostick in support of its motion for summary judgment. That's in the supplemental excerpts beginning at page 748 through 751. It establishes that every factor in K.B. Holmes is satisfied here. There was no evidence put in by Wasco contrary to that, and therefore the district court correctly determined the issue. I think Wasco misinterprets the cases when it talks about the stream of commerce. According to Wasco's theory, every time a component part manufacturer sells a product, it goes into the stream of commerce. I think it's clear when you look at the cases talking about the stream of commerce factor, they're talking about the stream of commerce when it goes out to the ultimate consumer, not as a component makes its way from seller to seller until the ultimate manufacturer. I think also Wasco overemphasizes or erroneously emphasizes a focus on the identity of the defendant rather than the identity of the product. According to Wasco's theory, whether the economic loss theory would apply would depend on who the defendant is, and that's an issue. There's certainly no support for it. The district court correctly determined the privity of contract is not required in order to assert the economic loss doctrine. The other key factor apart from the Duffy declaration and K.B. Holmes' return to the statute of limitations, the evidence is overwhelming and undisputed that Wasco in 1995 knew it had a problem and believed that it was the sealant that was at fault. There are a number of key admissions regarding this at the deposition of Robert Samson in his capacity as Wasco's 30B6 deponent. In addition, Mr. Samson put in a declaration in which he said that in 1996, Wasco determined not to use BOSIX polyurethane sealant further because it believed that its failures were attributable to it. And even in its reply brief, I believe, Your Honor, Wasco admits what essentially is the case law standard for triggering the statute of limitations. At page 10 of the reply brief, Wasco writes, ''Appellees read too much into Mr. Samson's statement that he, quote, ''always suspected the sealant as a potential cause of the seal failures. ''Samson's suspicions simply put him on notice that he, slash Wasco, had to reasonably investigate.'' Also at page 12, Wasco writes, ''The seals were failing at a higher rate.'' Of course, Samson was suspicious of the sealant. Wasco attempts to run away from the statutory standard by relying on case law that was decided before the Jolly v. Eli Lilly case, which changed the landscape in California. According to Wasco, a duty to investigate is triggered and only after the investigation is concluded does the statute begin to run. Jolly said exactly the opposite. And even in a case, the Rivas case that Wasco cites in his papers, specifically says, ''As we have discussed, the Supreme Court rejected the proposition that the statutory clock did not begin to tick and to the plaintiff knew or reasonably should have known the facts constituting the wrongful conduct as well as the fact of her injury and its relation to the product in favor of the rule that the statute of limitations begins to run when the claimant suspects or should suspect that his or her injury was, quote, ''caused by someone's wrongdoing.'' And that's at page 228 of 98, Calap 4th. The evidence is so overwhelming in terms of Wasco's knowledge in 1995 that I would like to point out a few passages from the depositions that directly show that. At page 332 of the supplemental excerpts, Mr. Samson testifies, ''If your insulated glass is failing at a rate that's greater than 1 percent, then that's a concern. Typically, it should be well under 1 percent.'' Later, at pages 340 to 341 of the supplemental excerpts, Mr. Samson says, or the question is, ''Is it your understanding that in 1995, Wasco experienced a 3 percent seal failure rate for its heat mirror units? Is that consistent with your recollection?'' Answer, ''That would be consistent with my recollection.'' ''In 1995, did you formulate a view as to whether that was an elevated failure rate?'' Answer, ''Yes.'' ''Is it correct, sir, that neither in 1995 nor thereafter did you ever formulate the view that the sealant was not a potential cause of Wasco's seal failures?'' Answer, ''It would have always been in play as a potential cause.'' That's page 341 of the supplemental excerpts. There are many more that I could read. I will skip to the last one, which says at page 344 of the supplemental excerpts, ''I never thought the sealant wasn't part of the problem.'' Turning briefly, Your Honors, to the issues. Kennedy, what does that issue go to? Does it – if I understand correctly, it's when the damage occurs, not when they're aware that your client may have been involved. Does this go to demonstrate that they were aware there was damage? Certainly, in 1995, they knew they were damaged, because they had a 3 percent failure rate when they believed the failure rate should be 1 percent. In a 1995 letter to Ultraglass, the supplier of heat mirror units, Mr. Sampson wrote that he was very – Wasco was very concerned about the problem of its elevated failure rate. It knew it had a – it caused – called it a problem, said it was concerned about it, and definitely knew that it had damage in 1995. Okay. Turning briefly, Your Honors, to the issue of continuing wrong and conspiracy. Essentially, plaintiff's theory here is that he can continue to purchase a product that his client believes to be – his client can continue to purchase a product believed to be defective, and that that somehow extends the statute of limitations. Not only does the argument not make sense, there are two California cases which specifically deal with a very similar type of argument. One is the Rita M. case that says regardless of whether there's a conspiracy, the – if the plaintiff is on notice of her claims, the statute begins to run. In the Snap case, there was alleged wrongdoing in 1993. In 1994, the defendant allegedly lied about it at a deposition in another case. Apparently, the contract – there was allegedly a contract to steal trade secrets that was entered into in 1994 and continued to be performed for years thereafter. Yet in the Snap case in 2002, the California Court of Appeal measured the statute of limitations from 1993 when the plaintiff should have been aware that it was on notice of its claims. Unless there are any further questions, Your Honors, I believe I'll sit down. Anything further? Anything of tape? Anything further? Anything of tape? Okay. Thank you very much. No further questions, and we appreciate your argument, both of you and both sides. And the matter just argued will be submitted. The Court will stand in recess for the day.
judges: Wallace, Trott, Rymer